UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

MATTHEW KEIL, JOHN DE LUCA, SASHA
DELGADO, DENNIS STRK and SARAH
BUZAGLO,

                             Plaintiffs,

               - against -

THE CITY OF NEW YORK; BOARD OF
EDUCATION OF THE CITY SCHOOL DISTRICT
OF NEW YORK; DAVID CHOKSHI, IN HIS
OFFICIAL CAPACITY OF HEALTH
COMMISSIONER OF THE CITY OF NEW YORK;
and MEISHA PORTER, IN HER OFFICIAL
CAPACITY AS CHANCELLOR OF THE NEW
YORK CITY DEPARTMENT OF EDUCATION,

                             Defendants.

-------------------------------------------------------------X

Case No.  1:21-cv-08773

MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFF'S
MOTION FOR A
PRELIMINARY INJUNCTION
AND TEMPORARY
RESTRAINING ORDER

**<u>ORAL ARGUMENT REQUESTED</u>**

Jonathan Robert Nelson (JN-8796)
Barry Black (BB-4602)
Sarah Child (SC-1011)
NELSON MADDEN BLACK LLP
475 Park Avenue South, Suite 2800
New York, NY 10016
Telephone: (212) 382-4300
jnelson@nelsonmaddenblack.com
bblack@nelsonmaddenblack.com
schild@nelsonmaddenblack.com
*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

ARGUMENT ................................................................................................................. 7

   I.   LEGAL STANDARD ......................................................................................... 7

   II.   PLAINTIFFS SATISFY THE REQUIREMENTS FOR A TEMPORARY
   RESTRAINING ORDER AND A PRELIMINARY INJUNCTION ....................... 7

      A.  There is a Strong Likelihood of Success on the Merits ................................ 8

      B.  Plaintiffs Will Suffer Irreparable Harm if No Injunction is Granted .............. 24

      C.  The Balance of the Equities Favors Granting a Preliminary Injunction ......... 24

      D.  A Preliminary Injunction is in the Public Interest ....................................... 25

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Clapper*,
 804 F.3d 617 (2d Cir. 2015) ............................................................................................ 7

*Alexander v. Gardner-Denver Co.*,
 415 U.S. 36, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (1974) ..................................................... 9

*Avard v. Dupuis*,
 376 F. Supp. 479 (D.N.H. 1974) ..................................................................................... 11

*Baker-Chaput v. Cammett*,
 406 F. Supp. 1134 (D.N.H. 1976) ................................................................................... 12

*Barrentine v. Ark.-Best Freight Sys.*,
 101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981) ........................................................................ 9

*Beal v. Stern*,
 184 F.3d 117 (2d Cir. 1999) ............................................................................................. 9

*Bowen v. Roy*,
 476 U.S. 693 (1986) ....................................................................................................... 17

*Bowles v. N.Y. City Transit Auth.*,
 No. 00 Civ. 4213 (BSJ)(MHD), 03 Civ. 3073 (BSJ)(MHD), 2006 U.S. Dist. LEXIS 32914 (S.D.N.Y.
 May 23, 2006) ................................................................................................................. 22

*Bucklew v. Precythe*,
 139 S. Ct. 1112 (2019) ............................................................................................. 8-9, 9

*Buff. Forge Co. v. Ampco-Pitt. Corp.*,
 638 F.2d 568 (2d Cir. 1981) ........................................................................................... 24

*Burgett v. Texas*,
 389 U.S. 109 (1967) ......................................................................................................... 1

*Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*,
 768 F.3d 183 (2d Cir. 2014) ........................................................................................... 14

*Church of Lukumi Babalu Aye v. City of Hialeah*,
 508 U.S. 520 (1993) ........................................................... 13-14, 14, 17, 18, 20-21

*Citizens United v. FEC*,
 558 U.S. 310 (2010) ......................................................................................................... 8

*City of Cleburne v. Cleburne Living Ctr.*,
 473 U.S. 432 (1985) ....................................................................................................... 14

*Crespo v. 160 W. End Ave. Owners Corp.*,
    253 A.D.2d 28, 687 N.Y.S.2d 79 (1st Dep't 1999) ............................................................. 9

*Echo Design Grp., Inc. v. Zino Davidoff S.A.*,
    283 F. Supp. 2d 963 (S.D.N.Y. 2003) ................................................................................ 7

*Eisenberg v. Advance Relocation & Storage, Inc.* ,
    237 F.3d 111 (2d Cir. 2000) ............................................................................................. 9

*Elrod v. Burns*,
    427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) ............................................... 23-24

*Emp. Div. v. Smith*,
    494 U.S. 872 (1990) ................................................................................................... 12, 17

*Farina v. Bd. of Educ.*,
    116 F. Supp. 2d 503 (E.D.N.Y. 2000) ............................................................................ 21, 22

*Fowler v. Transit Supervisors Org.*,
    No. 96 Civ. 6796 (JGK), 2000 U.S. Dist. LEXIS 23217 (S.D.N.Y. Sept. 6, 2000) ............................. 9

*Fulton v. City of Phila.*,
    141 S. Ct. 1868 (2021) .......................................................................................... 16-17, 18

*Gallagher v. N.Y. State Bd. of Elections*,
    477 F. Supp. 3d 19 (S.D.N.Y. 2020) ................................................................................. 25

*Gildea v. Bldg Mgmt.*,
    No. 10 Civ. 3347 (DAB), 2011 U.S. Dist. LEXIS 93662 (S.D.N.Y. Aug. 16, 2011) ....................... 9

*Hornsby v. Allen*,
    326 F.2d 605 (5th Cir. 1964) ......................................................................................... 12

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC* ,
    565 U.S. 171 (2012) ....................................................................................................... 13

*Humphrey v. Council of Jewish Fed'ns*,
    901 F. Supp. 703 (S.D.N.Y. 1995) ................................................................................... 9

*Int'l Soc. for Krishna Consciousness, Inc. v. Barber*,
    650 F.2d 430 (2d Cir. 1981) ....................................................................................... 12-13

*Lynch v. Pathmark Supermarkets*,
    987 F. Supp. 236 (S.D.N.Y. 1997) ................................................................................... 9

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
    138 S. Ct. 1719 (2018) .................................................................................................. 14

*Matter of Monroe Cnty.*,
    132 A.D.3d 1373 (4th Dep't 2015) .................................................................................. 9

iv

*Mitchell v. Cuomo*,
    748 F.2d 804 (2d Cir. 1984) ............................................................................................ 24

*N.Y. Progress & Prot. PAC v. Walsh* ,
    733 F.3d 483 (2d Cir. 2013) ............................................................................... 7, 24, 25

*Ram v. Lal*,
    906 F. Supp. 2d 59 (E.D.N.Y. 2012) ............................................................................. 24

*Raper v. Lucey*,
    488 F.2d 748 (1st Cir. 1973) .......................................................................................... 12

*Roman Catholic Diocese v. Cuomo*,
    141 S. Ct. 63 (2020) ............................................................................................. 8, 13, 15

*Sherr v. Northport-E. Northport Union Free Sch. Dist.*,
    672 F. Supp. 81 (E.D.N.Y. 1987) ............................................................................ 21, 23

*Soto v. Bronx Leb. Hosp.*,
    No. 96 Civ. 7200 (LMM), 1997 U.S. Dist. LEXIS 11412 (S.D.N.Y. Aug. 5, 1997) ........... 9

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.*,
    450 U.S. 707 (1981) ................................................................................................. 21-22

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    137 S. Ct. 2012 (2017) ................................................................................................... 13

*Tsombanidis v. W. Haven Fire Dep't*,
    352 F.3d 565 (2d Cir. 2003) .......................................................................................... 14

*U.S. Bulk Carriers, Inc. v. Arguelles*,
    400 U.S. 351, 27 L. Ed. 2d 456, 91 S. Ct. 409 (1971) ..................................................... 9

*United States v. Nat'l Treasury Emps. Union*,
    513 U.S. 454 (1995) ......................................................................................................... 8

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ....................................................................................................... 22

*Wright v. Universal Mar. Serv. Corp.*,
    525 U.S. 70, 119 S. Ct. 391, 142 L. Ed. 2d 361 (1998) ................................................... 9

**Statutes**

46 U.S.C. § 596 ....................................................................................................................... 9

46 U.S.C. § 2164 ................................................................................................................... 23

## PRELIMINARY STATEMENT

The proverbial road to hell, it is said, "is paved with good intentions."  *Burgett v Texas*, 389 US 109, 120 (1967).  Amidst the historic pandemic of Covid-19, New York City has seemingly determined that, at least with regard to its public schools, the cure for COVID lies in mass vaccinations.  Toward that end, the New York City Department of Education has implemented a vaccine mandate, expressly designed to "*potentially* save lives, protect public health, and promote public safety."  But, in doing so, the department trounces the First Amendment to the United States Constitution in defiance of its proscription against laws that prohibits the free exercise of religion. In applying this mandate to some groups and not to others, while refusing to properly grant exemptions to those who hold and profess sincerely held religious beliefs, the mandate has been enacted and enforced in a manner utterly inconsistent with the First Amendment.

**STATEMENT OF FACTS**

A comprehensive recitation of the relevant facts is contained within the accompanying Complaint, to which the Court is respectfully referred.  The following summary encapsulates the key facts relevant to this Memorandum.

On July 21, 2021, New York City Mayor Bill DeBlasio announced what has come to be known as the "Vax-or-Test" policy, stating: "What we're doing is mandate for the folks who work in our public hospitals and clinics, they need to be safe, the people they serve need to be safe. So, we're saying, get vaccinated, or get tested once every week. It's a fair choice."  *See* transcript, MSNBC Morning Joe (July 21, 2021)  https://www1.nyc.gov/office-of-the-mayor/news/508-21/transcript-mayor-de-blasio-appears-live-msnbc-smorning-joe.

On July 21, 2021, Department of Health and Mental Hygiene ("DOHMH") Commissioner Dr. Dave A. Chokshi signed an order applicable to staff in public healthcare settings, requiring Vax-or-Test.  *See Declaration of Jonathan R. Nelson, ¶ 3.*

On August 10, 2021, Commissioner Chokshi signed an order applicable to staff in residential congregate settings, requiring Vax-or-Test.  and *See Declaration of Jonathan R. Nelson, ¶ 4.*

A mere two weeks later, on August 24, 2021, Commissioner Chokshi signed an order ("Original Mandate") mandating vaccination, but disallowing the "test" option, for employees of the New York City Department of Education ("NYC DOE"). *See Declaration of Jonathan R. Nelson, ¶ 5.*  The Original Mandate was made applicable to: **(1)** "all DOE staff"; **(2)** "all City employees who work in-person in a DOE school setting or DOE building"; **(3)** "all staff of contractors of DOE and the City who work in-person in a DOE school setting or DOE building";

2

**(4)** "all employees of any school serving students up to grade 12 and any UPK-3 or UPK-4program that is located in a DOE building who work in-person, and all contractors hired by such schools or programs to work in-person in a DOE building." *See Declaration of Jonathan R. Nelson, ¶ 5.*

Notably, the Original Mandate, as well as subsequent orders, was not made applicable to certain other classes of individuals, including (1) bus drivers; (2) workers at "UPK" programs not located in a NYC DOE building; *See Declaration of Jonathan R. Nelson, ¶ 11;* (3) "Individuals entering a DOE school building for the limited purpose to deliver or pickup items"; (4) "Parents or guardians of students who are conducting student registration or for other purposes identified by DOE as essential to student education and unable to be completed remotely"; or (5) "Individuals entering for the purposes of voting or, pursuant to law, assisting or accompanying a voter or observing the election." *See Declaration of Jonathan R. Nelson, ¶ 5.*

On September 1, 2021, the United Federation of Teachers ("UFT") commenced an expedited arbitration ("UFT Arbitration") intended to challenge the implementation of the Original Mandate.

On September 9, 2021, the UFT and other labor unions representing employees of NYC DOE filed a lawsuit ("New York State Litigation") in the New York State Supreme Court, County of New York, mounting a facial challenge to the constitutionality of the Original Mandate.[1]

On September 10, 2021, arbitrator Martin F. Scheinman issued a ruling in the UFT Arbitration ("UFT Award") that required NYC DOE to permit religious exemptions to its vaccine requirements but imposed unconstitutional restrictions on the manner in which requests for such

---

[1] *New York City Municipal Labor Committee, et al., v. The City of New York, et al.*, No. 158368/2021 (N.Y. Co.).

exemptions were to be adjudicated and draconian consequences for unvaccinated NYC DOE employees who failed to obtain such an exemption and refused to be vaccinated, apparently composed entirely of language and procedures proposed by the City and the UFT.

Inter alia, the UFT Award contained the following requirements:

- Requests for exemption must be submitted via SOLAS, a NYS DOE internet portal, by no later than 5 PM on Monday, September 20, 2021;
- A letter from a religious official (clergy);
- Exemption requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine and where documentation of such public statement is readily available (e.g., from an online source);
- Exemption requests that are personal, political, or philosophical in nature shall be denied;
- Exemption requests shall be considered only for recognized and established religious organizations ("*e.g.*, Christian Scientists").
- The initial determination of eligibility for an exemption or accommodation shall be made by staff in the Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and Office of Employee Relations.
- If the employee wishes to appeal a denial, such appeal shall be made via SOLAS within *one* school day of the DOE's issuance of the denial.
- The assigned arbitrator, at his or her discretion, shall either issue a decision on the appeal based on the documents submitted or hold an expedited (virtual) factual hearing.
- Appeal decisions shall be expedited without full opinion, and final and binding.
- An employee who is granted a religious exemption shall be permitted to remain on payroll, but in no event required/permitted to enter a school building while unvaccinated, for so long as the vaccine mandate is in effect. Such employees may be assigned to work outside of a school building (e.g., at DOE administrative offices) to perform academic or administrative functions as determined by the DOE. Employees so assigned shall be required to submit to COVID testing twice per week for the duration of the assignment.
- Any unvaccinated employee who has not requested an exemption, or who has requested an exemption which has been denied, may be placed by the DOE on leave without pay effective September 28, 2021, or upon denial of appeal, whichever is later, through November 30, 2021.
- During such leave without pay, employees shall continue to be eligible for health insurance.
- As of October 29, 2021, any employee who is on leave without pay due to vaccination status may choose to either:
  - separate from the NYC DOE, in which case the employee (1) is eligible for health insurance through September 5, 2022, unless the employee is eligible for health insurance from another source, e.g., a spouse's coverage or another job but (2) waives the right to challenge the involuntary resignation; or

> o <u>opt to extend the leave through September 5, 2022,</u> in which case the employee (1) is eligible for health insurance through September 5, 2022, and (2) shall have a right to return to the same school
> o <u>exercise neither of the above</u> options, in which case the NYC DOE shall terminate such employees as of December 1, 2021.

The Original Mandate was amended September 12.

September 13, 2021, marked the commencement of the 2021-2022 school year for NYC DOE students.

On September 14, 2021, Hon. Lawrence L. Love, Justice of the Supreme Court of the State of New York, County of New York, issued a temporary restraining order ("September 14 TRO") "[v]acating as arbitrary, capricious, and contrary to law the August 24, 2021, Order" and "Enjoining Respondents from implementing the Order." *See Declaration of Jonathan R. Nelson, ¶ 10.* The September 14 TRO was issued primarily because of its lack of a religious exemption, a key issue raised by the plaintiffs in that case in their memorandum of law.[2]

On September 15, 2021, the Commissioner of Health and Mental Hygiene signed a new order ("Mandate"), which "rescinded and restated" the standing September 12 order.[3] In substance, the Mandate added the following language:

> **"Nothing in this Order shall be construed to prohibit any reasonable accommodations otherwise required by law."** *See Declaration of Jonathan R. Nelson, ¶ 6.*

---

[2] Indeed, the same court vacated the September 14 TRO on September 29, noting that this amended language had obviated the purpose for which it had granted the September 14 TRO. *See Declaration of Jonathan R. Nelson, ¶ 11.*

[3] The Mandate was subsequently amended on September 28, but in no manner relevant to this lawsuit. *See Declaration of Jonathan R. Nelson, ¶ 7.*

5

It should be noted that the UFT Award has been the primary device utilized by the NYC DOE in enforcing the Mandate, as evidenced by Plaintiffs' denial letters.  For example, Plaintiff Delgado's denial letter states: "This application was reviewed in accordance with applicable law as well as the UFT Award in the matter of your union and the Board of Education regarding the vaccine mandate."  *See Declaration of Jonathan R. Nelson, ¶ 13.*  Indeed, the UFT Award itself notes that "[t]he UFT promptly sought to bargain the impact and implementation of the Vaccine Only mandate," confirming that the purpose for the arbitration was to provide implementation standards.

Thus, while the Mandate can and should be scrutinized facially, its enforcement is best analyzed through the prism of the UFT Award.  And while the Mandate is facially unconstitutional, its enforcement is fraught with religious liberty pitfalls.

6

## ARGUMENT

### I.  LEGAL STANDARD

To obtain a preliminary injunction, the moving party must ordinarily show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) the balance of hardships tips in his favor; and (4) an injunction is in the public interest. *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).  The standards for obtaining a temporary restraining order largely mirror those for obtaining a preliminary injunction. *See, e.g.*, *Echo Design Grp. v. Zino Davidoff S.A.*, 283 F. Supp. 2d 963, 966 (S.D.N.Y. 2003).

Where First Amendment rights are at issue (as here), the test for obtaining preliminary injunctive relief reduces essentially to a single prong: "the likelihood of success on the merits is the dominant, if not decisive, factor." *New York Progress & Prot. PAC v. Walsh,* 733 F.3d 483, 488 (2d Cir. 2013). This is so because the deprivation of rights itself "for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 4427 U.S. 347, 373 (1976); protection of First Amendment rights is per se "in the public interest," *New York Progress & Prot. PAC v. Walsh,* 733 F.3d 483, 488 (2d Cir. 2013); and the balance of hardships is entirely one-sided because "the Government does not have any interest in enforcing an unconstitutional law." *Id.*

### II. PLAINTIFFS SATISFY THE REQUIREMENTS FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

"Government is not free to disregard the First Amendment in times of crisis. At a minimum, that Amendment prohibits government officials from treating religious exercises worse than comparable secular activities, unless they are pursuing a compelling interest and using the least restrictive means available . . .. Yet recently, during the COVID pandemic, certain States seem to

have ignored these long-settled principles. *R.C. Diocese v. Cuomo*, 141 S Ct 63, 69 (2020) (Gorsuch, concurring).   New York City government, and the NYC DOE in particular, have recently run amok like a bull in the fragile china shop this nation's founders called the Constitution. Executive orders have issued as often as daily, rashly altering and reversing course and devising arbitrarily fluctuant policies in reckless disregard for sacrosanct constitutional rights.

Here, Plaintiffs can easily demonstrate a likelihood of success on the merits, as well as each of the remaining elements of a preliminary injunction.   The Court should therefore grant this motion in order to prevent the continued trampling of First Amendment rights with the rapidly approaching October 29 deadline at which Plaintiffs will be forced to either surrender their legal rights to sue the DOE over its unconstitutional actions or lose their income, health coverage and other benefits.

### A.  There is a Strong Likelihood of Success on the Merits

#### 1.  The Mandate is Unconstitutional both facially and as applied to Plaintiffs

As a preliminary matter, Plaintiffs' challenge to the Mandate is both facial and as-applied. To raise a constitutional objection to a law, a plaintiff must almost always assert that the law's application to the plaintiff violates the Constitution. The distinction between the two types of challenges, therefore, "goes to the breadth of the remedy employed by the Court, not what must be pleaded in the complaint." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 331 (2010) (citing *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 477-78 (1995)).

A holding or order that the law cannot be enforced against a particular litigant is "as applied"—i.e., the law, as applied to the plaintiff is unenforceable. A facial challenge, in contrast, is "a claim that the law or policy is unconstitutional in all its applications." *Bucklew v. Precythe*,

139 S. Ct. 1112, 1127 (2019). A holding that a law is facially unconstitutional means the law is unenforceable against any party, no matter if it is a party to the litigation.

The distinction between as-applied and facial challenges "does not speak at all to the substantive rule of law necessary to establish a constitutional violation." *Id*. at 1127. Nor does it speak to how the state will, in the future, enforce the law. Plaintiffs have the right to request injunctive relief now—whether the law is unconstitutional as applied or on its face—to prohibit the executive from enforcing the Mandate, thereby removing the chilling effect the law has on the exercise of First Amendment rights.

"Although facial challenges are generally disfavored, they are more readily accepted in the First Amendment context." *Beal v. Stern*, 184 F.3d 117, 125 (2d Cir. 1999). Here, Plaintiffs assert both facial and as-applied challenges to both the Mandate and the UTD Award.[4]

---

[4] Plaintiffs' standing here is unaffected by arbitration proceeding that resulted in the arbitration award; Plaintiffs may challenge the UTF Award's constitutionality directly in this court and need not attack it via a CPLR Article 75 proceeding in state court. This is so because

> [n]ot all disputes between an employee and his employer are suited for binding resolution in accordance with the procedures established by collective bargaining. While courts should defer to an arbitral decision where the employee's claim is based on rights arising out of the collective-bargaining agreement, different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers.

*Barrentine v. Arkansas-Best Freight Sys*., 450 U.S. 728, 737 (1981).

Consequently, collectively bargained dispute-resolution procedures control when it comes to controversies that occur over the terms and conditions of employment including wages, hours, and working conditions. *Id.* at 734-35. But statutory and constitutional rights "devolve on [employees] as individual workers, not as members of a collective organization" and are "not waivable." *Id*. at 745.

---

*Barrentine* v. *Arkansas-Best Freight System, Inc.* speaks directly to this point: the issue there was "whether an employee may bring an action in federal district court, alleging a violation of the minimum wage provisions of the Fair Labor Standards Act, . . . after having unsuccessfully submitted a wage claim based on the same underlying facts to a joint grievance committee pursuant to the provisions of his union's collective-bargaining agreement." *Id.* at 729-730. Respondents in that case argued that "the collective-bargaining agreement between Arkansas-Best and petitioners' union requires that 'any controversy' between the parties to the agreement be resolved through the binding contractual grievance procedures' and that "the District Court made an unchallenged finding that the union did not breach its duty of fair representation" in processing petitioners' grievances. *Id.* at 736. Nevertheless, the unsuccessful arbitration did not strip the plaintiffs of standing in their federal lawsuit. The Court reasoned that

> even if the employee's claim were meritorious, his union might, without breaching its duty of fair representation, reasonably and in good faith decide not to support the claim vigorously in arbitration. Second, even when the union has fairly and fully presented the employee's wage claim, the employee's statutory rights might still not be adequately protected. Because the arbitrator is required to effectuate the intent of the parties, rather than to enforce the statute, he may issue a ruling that is inimical to the public policies underlying the FLSA, thus depriving an employee of protected statutory rights. Furthermore, not only are arbitral procedures less protective of individual statutory rights than are judicial procedures, but also arbitrators very often are powerless to grant the aggrieved employees as broad a range of relief.

*Id.* at 728–29, 101 S. Ct. 1437, 1438–39, 67 L. Ed. 2d 641 (1981); *see also Matter of Monroe County (Monroe County Law Enforcement Assn.)*, 132 A.D.3d 1373, 1373-1374 (4th Dep't 2015) (allowing Union to proceed to arbitration against employer for violating collective bargaining agreement while "certain of its members commenced an action in federal court under the FLSA"); C*respo v. 160 West End Ave. Owners Corp*., 253 A.D.2d 28, 687 N.Y.S.2d 79 (1st Dep't 1999) (holding that mandatory arbitration clause in collective bargaining agreement did not require dismissal of action for age discrimination); *U.S. Bulk Carriers, Inc. v. Arguelles*, 400 U.S. 351, 357, 27 L. Ed. 2d 456, 91 S. Ct. 409 (1971) (allowing plaintiff to bring wage claim in federal court under 46 U.S.C. § 596 even though he had not previously pursued arbitral remedies); *Fowler v. Transit Supervisors Org*., 2000 U.S. Dist. LEXIS 23217, *3 (S.D.N.Y. 2000) ("the Court of Appeals for the Second Circuit, however, has expressly held that collective bargaining agreement mandatory arbitration provisions cannot bar union members from bringing federal claims to court"); *Gildea v. Bldg Mgmt*., 2011 U.S. Dist. LEXIS 93662, *15 (S.D.N.Y. 2011) ("employees possess a statutory right of non-discrimination, and that statutory right exists separate and apart from the labor union's right to pursue remedies against a discriminatory employer, which arises under the bargained-for terms of the CBA"); *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 116 (2d Cir. 2000) ("the right to be treated in a non-discriminatory manner does not

As noted, here the Mandate implicitly incorporates the UTF Award, thus its itself subject to facial challenge. Further, the Mandate's vague nature gives rise to a separate facial challenge. Most importantly, the UTF Award is replete with facial deficiencies, such as the requirement for a religious official's note or the requirement that exemptions be granted only to those of a recognized faith (unconstitutionality of either is not dependent on its application to any particular Plaintiff).

## 2. The Mandate Violates Plaintiffs' Procedural Due Process Rights Because the Mandate Is Unconstitutionally Vague

Procedural due process "encompasses the right to be informed in advance of the hearing of "those current substantive criteria which will govern Board decisions.'" *Avard v. Dupuis*, 376 F Supp 479, 483 (DNH 1974). "The public has the right to expect its officers to observe prescribed

---

depend on the terms of any particular contract"); *Soto v. Bronx Leb. Hosp.*, 1997 U.S. Dist. LEXIS 11412, *1 (S.D.N.Y. 1997) (allowing employee to bring Title VII claim in federal Court after unsuccessful arbitration of claim); *Lynch v. Pathmark Supermarkets*, 987 F. Supp. 236, 241 (S.D.N.Y. 1997) (same); Humphrey v. Council of Jewish Fed'ns, 901 F. Supp. 703, 710 (S.D.N.Y. 1995) (same); *Rodriguez v Metropolitan Cable Communications, Inc.*, 2011 N.Y. Misc. LEXIS 6015, *6 (Sup. Ct. Queens Cnty. 2011( (finding that "a a plaintiff covered by a collective bargaining agreement containing an arbitration clause applicable to any disputes concerning the interpretation or application of the contract could, nevertheless, pursue his individual statutory rights under the FLSA").

Discrimination claims are substantively distinct from the type of contract dispute claims typically resolved by collective bargaining arbitration. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 59-60, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (1974) (holding "the federal policy favoring arbitration of labor disputes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully both his remedy under the grievance-arbitration clause of a collective-bargaining agreement and his cause of action under Title VII."5); *Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70, 79, 119 S. Ct. 391, 142 L. Ed. 2d 361 (1998) (holding agreement to arbitrate did not waive federal claim under the ADA because "[t]he cause of action [plaintiff] asserts arises not out of contract, but out of the ADA, and is distinct from any right conferred by the collective-bargaining agreement.").

standards and to make adjudications on the basis of merit. The first step toward insuring that these expectations are realized is to require adherence to the standards of due process; absolute and uncontrolled discretion invites abuse." *Hornsby v. Allen*, 326 F2d 605, 610 (5th Cir 1964). A hearing is not constitutionally '"meaningful" if prior thereto the plaintiff was unaware of the "grounds" upon which a decision would be rendered. *Raper v. Lucey*, 488 F2d 748, 753 (1st Cir 1973). "[T]he establishment of written, objective, and ascertainable standards is an elementary and intrinsic part of due process." *Baker-Chaput v. Cammett*, 406 F Supp 1134, 1140 (DNH 1976).

Here, Plaintiffs have been afforded no meaningful standards against which adjudication can be measured or considered. On its face, the phrase "[n]othing in this Order shall be construed to prohibit any reasonable accommodations otherwise required by law" does not authorize a particularized religious exemption. Indeed, it authorizes nothing more than unbridled discretion. The phrase merely states that the Order does not prohibit anything already required by law—that it does not on its face require violation of the law. As such, Plaintiffs procedural due process rights have not been met by the NYC DOE.

### 3. The Mandate Violates the Free Exercise Clause Because It Interferes with Plaintiffs' Freedom to Pursue Their Sincerely Held Religious Beliefs Concerning Vaccination

The First Amendment to the United States Constitution as applied to the States by the Fourteenth Amendment prohibits government from enacting laws, or enforcing laws in a manner, that would prohibit the free exercise of religion. This includes the right to "the performance of (or abstention from) physical acts," as well as the right to "profess whatever religious doctrines one desires," *Employment Division v. Smith*, 494 U.S. 872, 877 (1990) (emphasis added). *See also Intl. Socy. for Krishna Consciousness, Inc. v. Barber*, 650 F2d 430, 439 (2d Cir 1981) ("courts will . .

12

. invoke free exercise analysis where a belief is . . . acted upon in good faith"). Plaintiffs all maintain sincerely held religious beliefs that would preclude subjecting themselves to COVID vaccination. As such, no law can be enacted that would prohibit their freedom to object to vaccination, nor can a law be enforced in a manner that restricts this sacrosanct religious liberty.

The boundary line between the government's power and Free Exercise is often subject to the test articulated in *Smith*—namely, that a neutral, generally applicable law that incidentally burdens religion is not proscribed by the Constitution. However, while satisfying the *Smith* test is typically a necessary starting point, it is typically not sufficient. The Supreme Court has expressly rejected the idea "that any application of a valid and neutral law of general applicability is necessarily constitutional under the Free Exercise Clause," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017). It has also stated (in the context of faith-based education) that the contention that satisfaction of *Smith* neutrality grants the state a license to interfere in historically respected areas of religious autonomy "has no merit." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012) (unanimously barring application of employment discrimination laws against teacher in religious school on free exercise grounds, without application of *Smith* test).

"Because the challenged restrictions are not 'neutral' and of 'general applicability,' they must satisfy 'strict scrutiny,' and this means that they must be 'narrowly tailored' to serve a 'compelling' state interest." *R.C. Diocese*, 141 S. Ct. at 67.

### a)  Strict Scrutiny Applies Because the Mandate is Not Neutral

"The Free Exercise Clause . . . extends beyond facial discrimination. The Clause forbids 'subtle departures from neutrality[.]'" *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 US

520, 534 (1993) (internal citation omitted). *Lukumi* requires that a court "survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Id*. Furthermore, government must not "defer[ ] to the [discriminatory] wishes or objections of some fraction of the body politic." *City of Cleburne, Texas v. Cleburne Living Ctr*., 473 U.S. 432, 448 (1985). Thus, a court may examine whether a reasonable jury could infer from this record that private citizens' "hostility motivated the City in initiating . . . its . . . efforts." *Tsombanidis v. West Haven Fire Dep't*., 352 F.3d 565, 580 (2d Cir. 2003). "Discriminatory intent may be inferred from the totality of the circumstances," including "by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 199 (2d Cir. 2014).

The legislative history, the circumstances surrounding the enactment of the Mandate and the Mandate's enforcement provide ample evidence of animus toward religion and those with religious objection of vaccination.

### i)   The Mandate Was Enacted with Animus Toward Religion

As noted, the Mandate triggers strict scrutiny because it was motivated by animus against a religious group, belief, or practice. *Lukumi*, 508 U.S. at 540-42 (plurality); *Masterpiece Cakeshop v. Colorado Civ. Rights Comm'n*, 138 S.Ct. 1719, 1722 (2018). In evaluating animus, courts look at "specific events leading to the . . . policy in question," "the legislative or administrative history," and contemporaneous statements . . . of the decisionmaking body." *Id.* (citing *Lukumi*).

14

In the first instance, when considering the vast number of faiths, faithful, religious institutions New York City boasts, particularly in light of the substantial amount of COVID litigation the City has recently seen, *see, e.g., R.C. Diocese*, 141 S Ct 63, it is hard to imagine that *any* legislation or executive order is not well-vetted by qualified lawyers and scrutinized for constitutional concerns.

Moreover, the "legislative or administrative history" here is enlightening.  The July 21, 2021, order applicable to staff in public healthcare settings, applied Vax-or-Test; so did the August 10, 2021, order applicable to staff in residential and congregate settings.  Yet, just 14 days later, the Mandate removed the "test" option and provided no religious mandates.  After great public outcry and expedited commencement of arbitration proceedings, an UFT Award calling for religious exemptions—albeit constitutionally flawed, and a court decision granting a TRO expressly for want of religious exemption, the Mandate issued with nary a mention of religious exemption, instead reluctantly offering up a vague, boilerplate disclaimer.  It could hardly be clearer that Commissioner Chokshi's teeth gritted and stomach churned at the notion of granting religious folks a pass.  The dire reluctance to authorize a proper religious exemption evidences religious animus, subjecting the Mandate to strict scrutiny.

Indeed, in light of the well-publicized issuance of the UTF Award on September 10, followed by the September 14 TRO, it is eminently reasonable to conclude that the Mandate's amended language was specifically designed to enable the Award Standards, which they must have contemplated and incorporated.  Consequently, the pattern of religious animus evident in in the Award Standards, as set forth below, demonstrates a lack of neutrality in the UTF Award itself.

15

### ii)  The Mandate Has Been Enforced with Animus Toward Plaintiffs

As noted above, the mechanism with which the Mandate has been enforced is the UFT Award. Applications for religious exemption have been processed by adopting and implementing standards set forth in the UFT Award ("Award Standards") and appeals from denials of such applications have been adjudicated by arbitrators in accordance with and pursuant to the Award Standards. Arbitrators and DOE officials enforcing the Mandate have implemented absolutely unconstitutional standards, despite being put on notice of their unlawfulness. They have also improperly suggested that various individuals should adhere to religious standards that are not their own, or accept the religious views of people whose views differ from their own.  They have refused to accept the sincerity of religious beliefs that they did not deem to be reasonable, and sometimes even ambushed those who seek exemption with improper lines of questioning, as discussed infra.

### b)  Strict Scrutiny Applies Because the Mandate is Not Generally Applicable.

Though the Mandate may at first glance appear generally applicable, a closer look reveals at least five groups or classes of people to whom the Mandate does not apply, as noted above, including bus drivers, workers at "UPK" programs not located in a NYC DOE building, individuals picking up or delivering to a DOE school building, parents or guardians who are registering students or engaged in "essential" activities, and those voting or assisting or accompanying a voter or observing the election.

In *Fulton v. City of Philadelphia*, the United States Supreme Court held that a law is not generally applicable when it "'invite[s]' the government to consider the particular reasons for a person's conduct by providing a 'mechanism for individualized exemptions.'" 141 S. Ct. 1868,

1877 (2021) (quoting *Smith*, 494 U.S. at 884). "[I]n circumstances in which individualized exemptions from a general requirement are available," like the Mandate at issue, "[a state actor] 'may not refuse to extend that system to cases of 'religious hardship' without compelling reason.'" *Lukumi*, 508 U.S. at 537 (quoting *Bowen v. Roy*, 476 U.S. 693, 708 (1986)). In describing this "compelling interest standard," also known as "strict scrutiny," the Supreme Court explained that such a law or policy will survive "only in rare cases," *Lukumi*, 508 U.S. at 546, because in order "[t]o satisfy the commands of the First Amendment," the state actor must "advance interests of the highest order," and the regulation at issue "must be narrowly tailored in pursuit of those interests." *Id*.

### i)   The Mandate provides individualized exemptions

"In circumstances in which individualized exemptions from a general requirement are available, the government "may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Lukumi*, 508 US at 537.

Even assuming that the NYC DOE's vaccination policy advances interests of the highest order, the availability of accommodations for individuals with religious objections, such as testing, masking, and social distancing requirements (or a combination of these)—which are provided for in various different orders issued by the same executive body—demonstrates that such a policy, as applied to Plaintiffs, is not narrowly tailored to pursue such interests. *See Dahl v. The Bd. Of Trustees of W. Mich. Univ.*, No. 1:21-cv-757, ECF No. 25 (Opinion and Order Granting a Preliminary Injunction) (W.D. Mich. Sept. 13, 2021) (finding that Western Michigan University's COVID-19 vaccination requirement for student athletes was not narrowly tailored to meet its compelling interest when plaintiff athletes were denied their religious exemption requests).

17

As noted, at least five classes of people are in fact exempted from the Mandate and therefore not subject to the UTF Award.  "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way. *Fulton*, 141 S Ct at 1877.  In examining *Lukumi*, *Fulton* explained that the City of Hialeah claimed that its ordinances prohibiting animal sacrifice

> were necessary in part to protect public health, which was 'threatened by the disposal of animal carcasses in open public places . . .. But the ordinances did not regulate hunters' disposal of their kills or improper garbage disposal by restaurants, both of which posed a similar hazard . . . The Court concluded that this and other forms of underinclusiveness meant that the ordinances were not generally applicable.

*Id*.

Here, the Mandate expressly purports to have been enacted to "potentially save lives, protect public health, and promote public safety." Despite this lofty goal, it conveniently carves out exemptions for bus drivers—who spend substantial time twice daily with numerous school children in the relatively tight and unventilated confines of a school bus, hundreds—perhaps thousands—of voters and election personnel, parents and UPS and FedEx drivers.  But, like the City of Hialeah, the NYC DOE's concerns for health and safety ends there: no religious exemptions ensue.

"It is established in our strict scrutiny jurisprudence that "a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 US at 547.  Plaintiffs have given their lives to educate and look out for the best interests of their students, yet self-righteous government

bureaucrats, whose rules and policies are as erratic as leaves in the wind,  deign to demand absolute obedience to their whims in defiance of this nation's most reverend constitutional traditions.

### ii)  The NYC DOE enforces the Mandate with boundless discretion

The DOE's mechanism for evaluating religious exemption requests—namely, the use of the UFT Award has proven to be an exercise in unfettered and standardless discretion. It has allowed DOE officials who made the original determination regarding employees' exemption requests and arbitrators who decide the appeals (and whose decisions are later adopted by the DOE which subsequently places employees who fail to obtain their exemptions on unpaid leave) to both strictly adhere to the terms of the UFT Award—which flagrantly violates the First Amendment rights of DOE employees as discussed *infra*—and to choose at random when to discard it, resulting in inconsistent results and the detriment of thousands of DOE employees.

Arbitrators and DOE officials in some instances have strictly abided by the UFT Award, and denied individuals a religious exemption when, for example, they did not have a clergy letter. Declaration of Christina Martinez, Esq. ("Martinez Dec") ¶ 37. Arbitrators and DOE officials in other cases have granted an individual a religious exemption, despite their lack of clergy letter, even though the Arbitrator's Award specifically requires one. Martinez Dec. ¶¶ 38-39.

With respect to another so-called "requirement" of the Arbitrator's Award—that one's First Amendment freedoms only warrant protection if there is membership in a religious group whose leader has not publicly supported the vaccine—DOE officials have stated repeatedly that the Arbitrator's Award has strict parameters and they are bound by them. *See, e.g.*, Martinez Dec. ¶ 17 They have thus denied numerous requests for exemption because the applicant happens to be a member of a denomination that has publicly supported the vaccine. *See, e.g.*, Keil ¶ 38. But an

attorney speaking on behalf of the DOE in a separate court case challenging the vaccination mandate before this Court has called the UFT Award simply a framework and stated that "there have been Roman Catholic people who have had exemptions granted" even though "the Pope has come out for vaccines." *Kane v. de Blasio*, 1:2021-cv-07863, ECF. No. 65 (S.D.N.Y. October 12, 2021) (Transcript of Conference), at 50.

The devastating impact of this boundless discretion is twofold; thousands of workers lose their livelihoods, their paychecks, and potentially their health insurance, while their religious freedom rights are trampled. Orthodox Jews have been told that their requests are suspect because a rabbi living in a different country (and under whose authority they are not bound) disagreed with their standpoint, despite letters of support from their own rabbis. *See, e.g.*, Martinez Dec. ¶¶ 33-35. Others who possessed the same beliefs were granted exemptions. Martinez Dec. ¶ 31. Some religious individuals have had to listen while their religious beliefs, denomination, or sect were conflated with those of another religious belief, denomination, or sect. Martinez Dec. ¶ 20. Plaintiff Matthew Keil, who was ordained in the Russian Orthodox Church, was told that his biblically based beliefs seemed merely personal, especially when other Orthodox Christians chose to get vaccinated. Keil Dec. ¶ 38. It was suggested to Plaintiff Delgado that other Christian denominations' support of the vaccination made her objection somehow insincere, when her own pastor never spoke in favor of it. Degado Dec. ¶¶ 31, 34. And others have been questioned at length and even coerced into defending the validity of their deeply held beliefs, which is a realm the government is forbidden to enter at all, let alone with a discretionary power. *See, e.g.*, Martinez Dec. ¶ 22-23, 43-46; Keil. Dec. ¶ 36; Strk Dec. ¶ 22; *see Lukumi*, 508 U.S. at 531 ("religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit

20

First Amendment protection.").

Ultimately, this has resulted in baffling and inconsistent results, with the arbitrators and DOE officials even coming to separate and distinct conclusions under substantially similar facts. Martinez Dec. ¶¶ 37-39. Such infinite discretion warrants the highest standard of scrutiny.

### c) The Mandate violates the Free Exercise Clause because it interferes with Plaintiffs' freedom to pursue their sincerely held religious beliefs concerning vaccination

The Mandate, as applied through the Award, requires

- A letter from a religious official (clergy)must be presented.

The law in New York is clear: such a requirement is blatantly unconstitutional. In *Farina v. Board of Education*, the Court held that individuals asserting religious objections to a public school vaccination "had no obligation to provide documentation from [their] church regarding their beliefs," and found the requirement imposed by the school secretary that they "obtain a letter from [their church]" to be "misplaced." 116 F. Supp. 2d 503, 507-508 (E.D.N.Y. 2000). Indeed, "[p]ersonal religious beliefs, as long as they are in fact religious, are sufficient . . . if sincerely and genuinely held." *Id*; *see also Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81 (E.D.N.Y. 1987) (holding unconstitutional a statutory scheme that conditioned eligibility for a religious vaccination exemption on documentation from clergy).

- Exemption requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine.

Again, the Supreme Court and the Courts of New York State have found that there is no requirement that for a belief to be religious and sincerely held, it must be consistent with those held by others in the denomination. In fact, such a requirement would be unconstitutional. *Thomas*

21

*v. Rev. Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715 (1981) (disagreement among sect workers as to whether their religion made it sinful to work in an armaments factory irrelevant to whether belief was religious in nature because, "[t]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect"); *Farina v. Bd. of Educ.*, 116 F. Supp. 2d 503  (E.D.N.Y. 2000) (beliefs "need not be consistent with the dogma of any organized religion, whether or not the plaintiffs belong to any recognized religious organization"); *Widmar v. Vincent*, 454 U.S. 263, 270, n.6 (1981) (it is unconstitutional for courts "to inquire into the significance of words and practices . . . in varying circumstances by the same faith. Such inquiries would tend inevitably to entangle the State with religion in a manner forbidden by our cases"); *Bowles v. N.Y. City Transit Authority*, 2006 U.S. Dist. LEXIS 32914, *59 n.18 (S.D.N.Y. 2006) (emphasis added) ("[i]t is true that there is a conflict in the record as to what exactly [plaintiff's] Church teaches - whether members are forbidden to work at all on the Sabbath, as Bowles argues, or whether the prohibition is only 'from sun-up till sun-down,' as two of the letters from Pastor Gooding seem to indicate. But the question of whether Bowles's Church actually prohibits what he *believes* it prohibits is one that this court need not answer and indeed is uninterested in asking").

- Exemption requests shall be considered only for recognized and established religious organizations ("*e.g.*, Christian Scientists").

It is well-settled law that an individual seeking to demonstrate a sincerely held religious belief need not prove that his or her belief is part of the recognized dogma of a religious sect, and the individual need not even be part of a recognized religious sect themselves. It is only necessary that the belief be religious in nature and sincerely held.

22

In *Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81 (E.D.N.Y. 1987), the Eastern District of New York held that the limitation of a religious exemption to New York's school vaccine mandate to "'bona fide members of a recognized religious organization' whose doctrines oppose such vaccinations is violative of both the establishment and free exercise clauses of the First Amendment to the United States Constitution," *id*. at 91, and must be expanded to exempt all persons whose sincerely held religious beliefs prohibited inoculation of their children.

> This provision violated the Establishment Clause because
>
> New York . . . conditioned the conferring of a statutorily created exemption on membership in a religious denomination upon which the state, if the attempted witticism can be forgiven, has bestowed a blessing of governmental approval. Subsection 9 of § 2164 makes available to members of certain religious organizations to which the state has given some sort of official recognition a statutory benefit for which other individuals who may belong to either an unrecognized religious group or possess their own personal religious beliefs are not eligible. The establishment clause surely cannot mean much if a preferential restriction such as that contained in § 2164(9) can pass constitutional muster.

As a result, New York State rewrote their religious exemption statute to state that anyone "with sincerely held religious beliefs against vaccination" was exempt, and no clergy certification was required. *Sherr* firmly prohibits the discrimination as applied by the NYC Department of Education.

Each of these requirements is plainly unconstitutional and should not be upheld by any court of law.

## B.  Plaintiffs Will Suffer Irreparable Harm if No Injunction is Granted

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690, 49 L. Ed.

2d 547 (1976). Indeed, "[t]he Second Circuit has stated that '[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'" *Ram v. Lal*, 906 F. Supp. 2d 59, 69 (E.D.N.Y. 2012) (quoting *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984)).

Here, Plaintiffs' First Amendment rights have been violated and are continuing to be violated every day in these arbitrary and capricious arbitration proceedings in which their beliefs are improperly doubted and unconstitutional standards are imposed. Furthermore, Plaintiffs also face the egregiously unfair choice of giving up their legal right to sue over DOE's unconstitutional actions or forfeiting their health insurance.

There is no question that this prong is satisfied.

## C.  The Balance of the Equities Favors Granting a Preliminary Injunction

Typically, "the movant must show that the harm which he would suffer from the denial of his motion is 'decidedly' greater than the harm his opponent would suffer if the motion was granted." *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981).  But in a First Amendment case, as noted above, the balance of hardships is entirely one-sided because "the Government does not have any interest in enforcing an unconstitutional law." *Walsh,* 733 F.3d at 488. In any event, given the schizophrenic "scientific" COVID standards, the ever-changing executive orders, the disparate rules for different classes or groups of people, and the chaotic stab-in-the-dark enforcement "procedures," the equities weigh heavily in favor of the tried and true First Amendment, the ability for Plaintiffs and their families to have health insurance, to earn a living, to live comfortably with their faith.

24

### D.  A Preliminary Injunction is in the Public Interest

Here, a preliminary injunction is in the public interest, as "securing First Amendment Rights is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 50 (S.D.N.Y. 2020) ("securing First Amendment rights is in the public interest")  (internal  quotation  marks  and alteration omitted). Given the free exercise rights at stake, this element is unmistakably satisfied.

## CONCLUSION

For the reasons set forth above, Movants respectfully request that their motion by order to show cause for the entry of (1) a temporary restraining order pending the resolution of the motion for a preliminary injunction, and, after expedited discovery, (2) a preliminary injunction pending the resolution on the merits of the present action be granted.

Dated:  New York, New York
        October 27, 2021

                                    **NELSON MADDEN BLACK LLP**
                                    *Attorneys for Plaintiff*

                                    By: Barry Black
                                    475 Park Avenue South, Suite 2800
                                    New York, NY 10016
                                    (212) 382-4300

                                    Jonathan R. Nelson
                                    Sarah E. Child