UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                                                  :

MICHAEL KANE, et al.,                       :

                                Plaintiffs,          :

                - against -                     :    Case No. 21-cv-7863 (VEC) (Lead)

BILL DE BLASIO, et al.,                 :

                                Defendants.        :
-------------------------------------------------------------X

MATTHEW KEIL, et al.                 :

                                Plaintiffs,          :

                - against -                     :    Case No. 21-cv-8773 (VEC)

THE CITY OF NEW YORK, et al.,     :

                                Defendants.        :
-------------------------------------------------------------X

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR ATTORNEYS' FEES AND COSTS**

**PRELIMINARY STATEMENT**

This motion seeks attorneys' fees only for the thirteen Moving Plaintiffs who received injunctive relief and whose claims are now concluded following the Second Circuit's March 2025 mandate. Plaintiffs expressly reserve their right to seek additional fees for ongoing work on behalf of Plaintiffs Heather Clark and Natasha Solon, whose claims continue and are not part of this fee application.

Defendants' opposition (ECF No. 221) fundamentally mischaracterizes both the relief obtained and the legal standard for prevailing party status. The victory in *Kane v. De Blasio*, 19 F.4th 152 (2d Cir. 2021) (*Kane I*), was not simply about obtaining employment benefits—it was

1

about securing the constitutional right to have religious accommodation requests judged under lawful, non-discriminatory standards rather than the facially unconstitutional process Defendants originally employed. This constitutional process victory materially altered the legal relationship between the parties and provides the basis for prevailing party status under 42 U.S.C. § 1988.

The Second Circuit's holding in *Kane I* that Defendants' original religious accommodation policies were "neither neutral nor generally applicable" and "likely violated the First Amendment" established enforceable constitutional protection that continues to benefit affected employees, as confirmed in *New Yorkers for Religious Liberty v. City of New York*, 125 F.4th 319 (2d Cir. 2024) (*NYFRL*). As a result of the *Kane I* victory, one Plaintiff was reinstated with back pay, and all Moving Plaintiffs and hundreds of their colleagues received fresh review of their religious accommodation requests, as a form of remedial relief to remedy the discrimination they faced under the first policy.

Defendants' attempt to minimize this relief as "voluntary" or "transient" ignores that the relief was court-ordered and created binding constitutional precedent. The Second Circuit's orders in *Kane* and *NYFRL* show that the relief carried the kind of judicial imprimatur that entitles them to fees as prevailing parties on at least one significant issue in the case (to wit, getting the original religious accommodation policy struck down as unconstitutional). Plaintiffs' fee request of $530,541.40 reflects extraordinary billing restraint, seeking compensation only for a portion of the work through the *Kane I* victory, writing off substantial time and expenses, and declining to seek over $1 million in subsequent fees arguably necessary to uphold the original Judgment. Defendants' proposed 90% further reduction to $49,000 is arbitrary and ignores the significant constitutional victory achieved.

## ARGUMENT

I. **PLAINTIFFS ARE PREVAILING PARTIES**

**A. The Core Victory Was Securing A Constitutional Process, Not Individual Employment Benefits**

Defendants mischaracterize the nature of Plaintiffs' success by focusing on individual employment outcomes rather than the constitutional violation at the heart of this case. The principal harm was not loss of employment—it was being subjected to a religious accommodation process that discriminated against minority and idiosyncratic religious beliefs in violation of the Free Exercise Clause. *Kane I*, 19 F.4th at 167-68.

Because of this litigation, the Second Circuit confirmed the constitutional harm, holding that Defendants' original policies were "neither neutral nor generally applicable" and likely failed strict scrutiny because Defendants did not and could not offer any compelling reason to have facially favored certain religious organizations over others, required letters from religious officials, and categorically excluded accommodation for those whose "leaders" were vaccinated. *Id.* These policies created "a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Like in *Ne. Fla. Chapter of Associated Gen. Contractors,* the constitutional injury was "the denial of equal treatment," not merely employment consequences. *Id.*

Defendants argue that because only one Moving Plaintiff was reinstated, the rest of the Plaintiffs cannot be said to have prevailed. As a threshold matter, this argument concedes that attorneys' fees should be awarded for the litigation that led to Plaintiff Castro's reinstatement with

3

back pay. The issues litigated would have taken the same amount of work had it been for one Plaintiff or many, and Plaintiffs should be awarded their full fees on this basis alone.

But though they were not all reinstated, all Plaintiffs still received meaningful relief, and prevailed on the primary issue, which was their assertion that the original religious accommodation policy was discriminatory and unconstitutional. They prevailed on this issue. The Supreme Court clarifies that the constitutional harm in discrimination cases is the denial of equal treatment, not the ultimate ability to obtain the benefit, stating:

> Singly and collectively, these cases stand for the following proposition: When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. See, *e.g., Turner v. Fouche, supra,* 396 U.S., at 362, 90 S.Ct., at 541 ("We may assume that the [plaintiffs] have no right to be appointed to the ... board of education. But [they] do have a federal constitutional right to be *considered* for public service without the burden of invidiously discriminatory disqualifications") (footnote omitted) (emphasis added). And in the context of a challenge to a set-aside program, the "injury in fact" is the inability to compete on an equal footing in the bidding process, not the loss of a contract. See *Croson,* 488 U.S., at 493, 109 S.Ct., at 721 (principal opinion of O'CONNOR, J.) ("The [set-aside program] denies certain citizens the *opportunity to compete* for a fixed percentage of public contracts based solely upon their race").

Whether or not any particular Plaintiff could ultimately be accommodated, their right to nondiscriminatory consideration of their accommodation request was violated by the original accommodation policies. *Kane I* directly remedied this constitutional harm by: (1) declaring the original process unconstitutional; (2) prohibiting use of the discriminatory standards; and (3) mandating review under lawful constitutional standards. This relief—the right to constitutional equal treatment—is what Plaintiffs sought and obtained. While Plaintiffs do not concede that the

Citywide Panel process fully satisfied these constitutional requirements (a question they are petitioning the Supreme Court to review), the Second Circuit's apparent acceptance of that process as Constitutional and sufficient to remediate the acknowledged original harm for the Moving Plaintiffs establishes that they received the constitutional process relief they sought for purposes of prevailing party analysis.

**B. Kane I Created Binding Constitutional Precedent with Material Legal Effect**

Defendants' "no material alteration" argument ignores that *Kane I* established binding constitutional precedent that fundamentally changed the legal landscape. While the preliminary injunction's immediate relief was limited to the named plaintiffs, the constitutional holding had broader effect—as *NYFRL* definitively proves.

In *NYFRL*, the Second Circuit granted relief to Natasha Solon, who was never covered by the *Kane I* injunction, based solely on the constitutional precedent established in *Kane I*. The Court held that because *Kane I* determined "the Arbitration Award Standards under which Solon was suspended were very likely unconstitutional," she could pursue First Amendment claims even years later and even though the City was not ordered in *Kane I* to provide her with any fresh review. *NYFRL*, 125 F.4th at 334-35. This demonstrates that *Kane I* created enforceable constitutional holding extending beyond the original plaintiffs—the paradigmatic "material alteration of legal relationship" required for prevailing party status.

As *NYFRL* shows, Defendants can no longer defend their original policies as constitutional in any forum. Any employee subjected to those invalidated standards now has viable constitutional claims based on *Kane I's* precedent. This enduring legal effect distinguishes this case from preliminary relief that merely preserves the status quo.

5

### C. The Relief Was Court-Ordered, Not Voluntary—This Is Not Catalyst Theory

Defendants' claim that the relief to the Moving Plaintiffs was "voluntary" and their catalyst theory argument both fail because *Kane I* included specific, enforceable judicial orders, not merely voluntary policy changes. The Second Circuit didn't just declare the policies unconstitutional—it ordered specific remedial procedures be provided to these Moving Plaintiffs, including: fresh consideration by a citywide panel, adherence to Title VII standards, prohibition on using the invalidated criteria, and back pay for successful applicants. *Kane I*, 19 F.4th at 169-70.

The sequence of events confirms this was court-compelled relief. Defendants "conceded" their policies were "constitutionally suspect" only after losing at oral argument—hardly voluntary reform. *Kane I*, 19 F.4th at 167. The Citywide Panel review was proposed only "pursuant to the Court's order" regarding each parties thoughts on "the proper scope of injunctive relief pending appeal." Linnane Decl., Ex. B (ECF No. 221-2). This proposal was then codified into binding judicial orders by both the Motions Panel and Merits Panel. This is precisely the "judicial imprimatur" that distinguishes enforceable court orders from mere catalyst settlements. *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001).

### D. Kane I Satisfies Buckhannon's Requirements for Enforceable Relief

*Buckhannon* requires "enforceable judgments on the merits" or even "court-ordered consent decrees"—clearly encompassing the orders here. 532 U.S. at 604. *Kane I* included judicial findings that defendants' procedures were unconstitutional (*judicial determination on the merits*) and court-ordered remedial procedures (*enforceable prospective relief*). The fact that defendants proposed the specific remedy doesn't transform this into a mere settlement—the Second Circuit adopted, modified, and enforced specific terms through binding judicial orders.

*NYFRL* establishes that the *Kane I* decision was merits based and shows enforceability. In *NYFRL,* the Second Circuit reinstated the constitutional claims of Plaintiff Solon, who was not a party to *Kane I* and not covered by that order. Nonetheless, the Court held that it was bound by its decision in *Kane I,* and had to reinstate her claims as she was only ever reviewed under the original accommodation policy, which was discriminatory. This demonstrates that the *Kane I* decision created enforceable rights extending beyond the original injunction's scope. This ongoing enforceability distinguishes *Kane I* from voluntary policy changes found insufficient under *Buckhannon*.

### E. The Successful Constitutional Challenge Was Neither Narrow nor Limited

Defendants attempt to minimize the victory by characterizing it as a narrow "as-applied" challenge, but *Kane I's* constitutional analysis addressed systemic flaws in the accommodation policies that affected all applicants. The Second Circuit found the standards were "neither neutral nor generally applicable" and included criteria that categorically discriminated against minority religious beliefs. *Kane I*, 19 F.4th at 167-68.

This constitutional defect wasn't limited to how the policy was applied to the original *Kane* and *Keil* plaintiffs—it was inherent in the policy structure itself. The Court's analysis of discriminatory criteria like favoring "recognized and established religious organizations" and requiring letters from religious officials applied to the policy generally, not just its application to named plaintiffs. *Id.* The systemic nature of this victory is confirmed by its impact on hundreds of DOE employees and its precedential effect in cases like *NYFRL,* where the Court applied the same holding to Plaintiff Solon.

### F. Defendants Misapply *Lackey v. Stinnie*

Defendants' reliance on *Lackey v. Stinnie*, 145 S. Ct. 659 (2025), is misplaced. In *Lackey*, preliminary relief was deemed "transient" because subsequent legislation mooted the case, stripping the relief of enduring effect. Here, *Kane I's* constitutional holding was not transient—it invalidated discriminatory policies and continues to provide constitutional protections, as confirmed in *NYFRL*. Unlike *Lackey*, where no merits determination occurred, *Kane I* included judicial findings that Defendants' procedures were unconstitutional, delivering "enduring judicial relief on the merits" that carried over into consideration of new Plaintiffs in *NYFRL*.

## II. THIS MOTION COVERS ONLY CONCLUDED CLAIMS WHILE PRESERVING RIGHTS FOR ONGOING LITIGATION

To be clear, this fee application seeks compensation only for work through the *Kane I* preliminary injunction victory on behalf of the thirteen Moving Plaintiffs whose claims concluded with the Second Circuit's March 2025 mandate. Plaintiffs expressly reserve their right to seek additional attorneys' fees for continued work on behalf of Heather Clark and Natasha Solon, whose claims remain active and are not included in this motion, other than that they will not seek reimbursement of these same fees if the group is awarded them for the first phase of this litigation.

## III. DEFENDANTS' ATTACKS ON BILLING RATES AND HOURS LACK MERIT

### A. Defendants' Rate Challenges Ignore Current Market Realities and Case-Specific Factors

Defendants' citation of $250-400/hour rates from "recent SDNY cases" lacks context and supporting evidence. They provide no details about the complexity, novelty, or success level of those matters. More importantly, recent appellate authority directly contradicts their position. In *Fields v. Kijakazi*, 24 F.4th 845, 851 (2d Cir. 2022), the Second Circuit reversed a district court's

reduction to $750/hour and affirmed $1,556/hour as reasonable—nearly triple Plaintiffs' requested rate.

Defendants' attack on Ms. Gibson's qualifications ignores her seventeen years of civil rights practice, Cornell Law School professorship, and recent $750/hour award in *DiCapua v. City of New York* for substantially similar work against these same defendants. Their critique of the Hruska declaration provides no counter-evidence—Andrew Hruska's credentials as a King & Spalding partner with extensive complex litigation experience make his rate opinion highly credible.

The requested $550/hour rate reflects the 2021 low-bono rates both firms offered to make constitutional litigation accessible, well below their current market rates of $725-850/hour. Given the four-year payment delay (not to mention the contingency nature of Gibson Law Firm's fee agreement) even higher rates would be justified under *Grant v. Martinez*, 973 F.2d 96, 100 (2d Cir. 1992).

Plaintiffs' substantial evidence supporting reasonable rates includes:

1. Hruska Declaration: Andrew Hruska, a King & Spalding partner, attested that $550/hour is "at or below prevailing market rates" for complex litigation in this District.
2. Recent Awards: Courts in this Circuit have approved rates of $750-$1,556/hour. *Fields v. Kijakazi*, 24 F.4th 845, 851 (2d Cir. 2022).
3. Comparable Success: Ms. Gibson was recently awarded $750/hour in *DiCapua v. City of New York* for related work against the same defendants and settled with the City of New York on another civil rights matter for $750/hour.

4. Current Rates: The requested $550/hour is below both firms' current rates ($725-$850/hour), accounting for the time value of money over the four-year delay.

**B. Defendants' Personal Attacks Are Irrelevant and Factually Wrong**

Defendants' attempts to diminish counsel's qualifications through internet searches and speculation about case volumes are improper and irrelevant. They also make no sense. For example, counsel insinuates that Ms. Gibson's "claims" of teaching part-time at Cornell Law School and working in civil rights is "refuted" with an article that expressly recognizes that Ms. Gibson is a professor at Cornell Law School and that her practice is focused on civil rights.

The relevant factors are extensive experience in constitutional and religious liberty law, successful outcome in a complex novel case, peer recognition and professional accomplishments, and reasonable rates compared to market standards. All attorneys in this matter meet that standard. Outside of her work in academia, Professor Gibson has practiced in the area of civil rights for over seventeen years and has won notable victories. Mr. Nelson (42 years) and Mr. Black (26 years) are recognized experts in religious liberty law with numerous reported cases and professional accolades.

**C. The Coordination Between Firms Was Efficient, Not Duplicative**

Defendants' "duplicative work" argument ignores that the firms were pursuing separate cases with different plaintiffs until the appeals were consolidated. Each firm necessarily had to develop its own factual record, interview its own clients, and prepare independent legal arguments. Once consolidated, the firms coordinated efficiently—dividing oral argument responsibilities and collaborating on briefing to avoid actual duplication.

The time records show appropriate billing judgment was exercised, with substantial reductions for any potentially overlapping work. Both firms wrote off over $1 million in subsequent fees, demonstrating extraordinary restraint. The 1,148 total hours (after reductions) for two law firms achieving constitutional vindication in complex emergency litigation is entirely reasonable, and the fact that each firm had to spend about the same amount of hours when the matters were independently handled by counsel that had no prior relationship supports the reasonableness of the hours expended.

**D. The Hours Expended Were Reasonable and Reflect Extraordinary Billing Restraint**

Defendants' claim that 1,148 hours (after reductions) is "excessive" ignores the extraordinary billing restraint Plaintiffs exercised, including the following reductions:

1. Limited Scope: Plaintiffs seek fees only through the preliminary injunction victory in December 2021—not the hundreds of thousands of dollars in additional fees incurred over the subsequent three-plus years of continued litigation.

2. Substantial Voluntary Write-Offs: Both firms wrote off substantial time expended before December 2021 and all time spent afterwards, seeking only a fraction of each firm's total time investment.

3. Complex Emergency Litigation: The billed period required round-the-clock work on compressed schedules for multiple interlocutory appeals that achieved constitutional vindication.

4. Reasonable for Results Obtained: The relief obtained—constitutional vindication, policy changes affecting 500+ employees, and national precedent—easily justifies the modest fees sought.

5. Block Billing Criticism Unfounded: The time entries provide sufficient detail for emergency constitutional litigation. Defendants' cherry-picked examples ignore both the litigation context, compressed deadlines, and Plaintiffs' billing restraint.

**E. Defendants' Proposed 90% Further Reduction is Unreasonable**

Defendants' request for a 90% reduction to $48,983 is arbitrary and ignores the extraordinary restraint Plaintiffs have already exercised. Such draconian cuts are reserved for cases with minimal success or egregious billing practices—neither present here. Plaintiffs achieved:

- Constitutional vindication affecting hundreds if not thousands of employees
- Precedent cited by other circuits
- Individual reinstatements and policy changes
- System-wide relief benefiting the broader DOE community

All while seeking compensation for only the narrow time period that achieved these results, not the extensive follow-up work that secured and implemented them. Moreover, it is irrelevant to the number of hours it took to litigate these claims whether three Plaintiffs ultimately get reinstated or thirteen, as the issues and relief were not assessed on a case-by-case basis in the Second Circuit proceedings, and were focused on the legality of the policy and process.

**F. The Fees Sought Relate to the Successful Claims**

The billing records show that virtually all time was spent on the successful First Amendment claims that resulted in the *Kane I* victory. The constitutional challenge that succeeded was the primary focus throughout, and the relief obtained vindicated that challenge. Under *Hensley*, when claims arise from a "common core of facts" and involve "related legal theories," courts should

"focus on the significance of the overall relief obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). Here, the First Amendment claims were central to all relief sought and obtained and this relief was significant, not just to these thirteen plaintiffs, but to hundreds of others.

## CONCLUSION

The thirteen Moving Plaintiffs whose claims have concluded are prevailing parties under controlling Supreme Court precedent. They secured meaningful judicial relief establishing their right to constitutional treatment in religious accommodation proceedings—a victory that materially altered the legal relationship with Defendants and created binding precedent that continues to benefit affected employees. This limited fee request of $530,541.40 represents reasonable compensation for achieving this constitutional victory while preserving rights to seek additional fees for ongoing work on behalf of Plaintiffs Clark and Solon. Defendants' opposition mischaracterizes both the law and facts and should be rejected.

Dated: Ithaca, New York
      May 28, 2025

Respectfully submitted,

*/s/Sujata S. Gibson*
Gibson Law Firm, PLLC
Attorneys for the *Kane* Plaintiffs
120 E Buffalo St, Suite 2
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law

*/s/ Jonathan R. Nelson*
Nelson Madden Black
Attorneys for the *Keil* Plaintiffs
475 Park Avenue South, Suite 2800
New York, NY 10016
(212) 382-4300

## ATTORNEY CERTIFICATION

Pursuant to Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Counsel of Record certifies that the total number of words in the memorandum of law, exclusive of the caption, table of contents, table of authorities, and signature block, is 3,241 words according to the "Word Count" function of Microsoft Word, the word-processing system used to prepare the document, and thus that the document complies with the word count limit set forth in Rule 7.1(c).

Dated: Ithaca, New York
       May 28, 2025

*/s/Sujata S. Gibson*